UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION—JACKSON

| | | |
|---|---|---|
| Brown Bottling Group, Inc. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. ____3:19-cv-142-HTW-LRA____ |
| v. | ) | |
| | ) | |
| Imperial Trading Co., L.L.C.; | ) | |
| Long Wholesale, Inc.; | ) | |
| AAA Cash & Carry Wholesale, Inc. | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## PLAINTIFF'S COMPLAINT & JURY DEMAND

Plaintiff Brown Bottling Group, Inc. ("Brown Bottling") brings this Complaint and Jury Demand against Defendants Imperial Trading Co., L.L.C. ("Imperial Trading"), Long Wholesale, Inc. ("Long Wholesale"), and AAA Cash & Carry Wholesale, Inc. ("AAA C&C") (collectively "Defendants") and states and alleges as follows:

## INTRODUCTION

1.     For almost 50 years, Brown Bottling has served as the exclusive distributor of Pepsi-Cola and Dr. Pepper beverage brand soft drinks in all or portions of 36 counties in Central and Southern Mississippi and two counties in Alabama.

1

2.     Brown Bottling is a licensee of multiple liquid refreshment beverages brands owned or licensed by PepsiCo, Inc. ("PepsiCo"). The most well-known of these Brands are "Pepsi-Cola," "Mountain Dew," and "Gatorade" and were licensed to Brown Bottling by PepsiCo pursuant to a series of perpetual Exclusive Bottling Appointments, which appointed Brown Bottling as the one and only authorized manufacturer, distributor, and seller of PepsiCo brands in a defined and exclusive geographic territory.

3.     Brown Bottling is also a licensee of multiple liquid refreshment beverages brands owned or licensed by Keurig Dr. Pepper Inc. ("KDP"). The most well-known of these Brands are "Dr. Pepper," "Sunkist," and "Canada Dry" and were licensed to Brown Bottling by KDP pursuant to a series of perpetual Exclusive License Agreements, which appointed Brown Bottling as the one and only authorized manufacturer, distributor, and seller of KDP brands in a designated and exclusive geographic territory.

4.     The system for manufacturing and distributing PepsiCo and KDP brands has existed for a century and functions as follows: PepsiCo and KDP produce concentrate—the flavor base for their trademarked liquid refreshment beverages— and sell it to a network of licensed independent bottlers like Brown Bottling. The bottlers then manufacture, sell, and deliver finished soft drinks in defined and exclusive geographic territories. The independent bottlers sell the finished

beverages to retailers who, in turn, sell PepsiCo and KDP products directly to the consuming public.

5.    The independent bottler's right to manufacture, distribute, and sell in exclusive territories is as old as the soft drink industry itself. In the case of PepsiCo and KDP bottlers, the right to manufacture, distribute, and sell exclusively in a defined geography is absolute. Indeed, as former PepsiCo President Roger Enrico once explained: "You see, bottlers don't have some temporary right to distribute Pepsi. They own their territories. They also own their bottling plants and their route trucks."

6.    Independent bottlers like Brown Bottling were given exclusive territories in part to protect (and continue to encourage) the century-worth of capital investments they committed to fully developing their businesses and local demand for PepsiCo and KDP brands throughout their exclusive territories. Over the years, independent bottlers like Brown Bottling have invested millions of dollars improving factory and warehouse operations, increasing manpower, and narrowly tailoring promotional and advertising campaigns to resonate with local consumers.

7.    To this day, Brown Bottling and other independent bottlers continue to make these investments with a simple objective in mind: to increase popular demand for PepsiCo and KDP brands in their exclusive territories. Without the

promise of exclusivity, the millions of dollars invested by bottlers to meet this objective would be all for naught.

8.    Exclusive territories also enhance the customer experience by allowing independent bottlers to properly service customer accounts and to conduct weekly quality control checks. Soft drinks are a perishable product with a short shelf-life. For this reason, independent bottlers are contractually obligated to prevent the sale of any outdated, sub-par, or expired PepsiCo and KDP products in their exclusive territories.

9.    In order to satisfy this contractual obligation, bottlers visit each of their accounts on a weekly basis, monitor the freshness of the soft drinks sitting on retail shelves, and rotate, replace, or destroy any outdated or expired product. By constantly calling on their customers and implementing various quality control measures, independent bottlers are able to minimize the risk of outdated product reaching consumers—a safeguard critical to maintaining the integrity of the PepsiCo and KDP brands.

10.    Because exclusive territories both incentivize bottlers to invest in their operations and maximize consumer demand, the distribution of soft drink products through the exclusive territory system stimulates interbrand competition (i.e., competition between PepsiCo and Coca-Cola).

11.    To preserve the integrity of licensed bottlers' exclusive territories, PepsiCo and KDP forbid the practice of "transshipping"—the manufacture,

distribution, or sale of PepsiCo and KDP products in a bottler's exclusive territory by anyone other than the licensed bottler (here, Brown Bottling).

12.     Third-party distributors who engage in unauthorized transshipping of PepsiCo and KDP products are "free-riders" with no allegiance to the PepsiCo and KDP brands or the independent bottlers licensed to sell and distribute them.

13.     Transshippers reap the benefits of the millions of dollars invested by the independent bottlers to create local demand for the brands and they do not conduct the necessary quality controls that PepsiCo and KDP contractually require of its independent bottlers.

14.     Because PepsiCo and KDP products are sold directly by licensed bottlers to the retailers through Direct-Store-Delivery ("DSD")—which is the only system authorized by PepsiCo and KDP for the sale of their trademarked products—there is no legitimate channel for unauthorized distributors like Defendants to acquire and transport trademarked PepsiCo and KDP products. And because transshippers like Defendants operate in unauthorized channels of trade different from PepsiCo's and KDP's authorized distribution network, PepsiCo, KDP, and Brown Bottling cannot properly and sufficiently exercise quality control over the trademarked products sold to local retailers and consumers.

15.     As a result, and unbeknownst to retailers and consumers, transshippers sell materially different, non-genuine, sub-par, and outdated PepsiCo and KDP trademarked brands to retailers and consumers who have no way of

knowing that those products are any different than the authorized PepsiCo and KDP trademarked products to which they typically purchase from Brown Bottling.

16.    In this way, transshippers like Defendants sell trademarked PepsiCo and KDP products to Brown Bottling's customers without authorization and in a manner that causes confusion, mistake, and deception with regard to the  true source, origin, and sponsorship of those products.

17.    The damaging effects of transshipping are proven and well-documented. Transshippers are not concerned with developing existing PepsiCo and KDP brands, securing additional shelf space for PepsiCo and KDP products, placing point-of-sale advertising materials, introducing and developing new brands, or selling only high-quality products. As a result, transshipping also undermines the benefits of exclusive territories, hurts customers and consumers, and stifles interbrand competition.

18.    PepsiCo and KDP also prohibit transshipping because it causes each and every licensed bottler to unintentionally breach their own contractual obligations. For instance, when transshipping occurs, licensed bottlers cannot sell PepsiCo and KDP brands to any and all channels and accounts located in their exclusive territories and they cannot prevent the sale of sub-par, non-genuine, outdated, or expired products to the retailers and consumers located in their exclusive territories.

19.    Preserving the territorial exclusivity of bottlers by forbidding the practice of transshipping isn't just a priority of the soft drink industry, it's Congress's policy too. In 1980, Congress enacted the Soft Drink Interbrand Competition Act, 15 U.S.C. § 3501 ("the Soft Drink Act"), which provides for the express "enforcement" of exclusive bottling agreements both "directly or indirectly," and is aimed point-blank at combatting third parties who transship in a licensed bottler's exclusive territory.

20.    To ensure the preservation of exclusive territories, Congress specifically contemplated that licensed bottlers may invoke the Soft Drink Act to enforce their rights in the courts. The House Report accompanying the Act's passage states that "It is the intent and purpose of [Congress] that the territorial agreements used in the soft drink industry shall be lawful and *may be judicially enforced*. . . ." (H.R. Rep. No. 1118, 96th Cong., 2d Sess. 6 (emphasis added).) Likewise, the corresponding Senate Report states that Congress's "intent and purpose" in adopting the Soft Drink Act was to ensure that "relevant territorial provisions are not only lawful, *but also enforceable through judicial proceedings*." (S. Rep. No. 645, 96th Cong., 2d Sess. 3 (1980) (emphasis added).)

21.    As one state supreme court observed, "that the Soft Drink Act authorizes bottlers to restrict" unauthorized sales "in order to prevent transshipping has been approved in every jurisdiction that has considered the issue." *See Owens v. Pepsi Cola Bottling Co. of Hickory, N.C., Inc.*, 412 S.E.2d 636,

673 (N.C. 1992) (citing voluminous federal case law). In fact, "A number of transshippers testified against the Act, [however] the record shows that Congress unequivocally rejected their position." *Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 177 (3d Cir. 1988).

22.    In this action, Brown Bottling seeks to enforce its territorial exclusivity rights and to enjoin Defendants from engaging in further unauthorized sales, which continue to deceive and confuse purchasers into believing they are buying genuine trademarked PepsiCo and KDP soft drink products when they are not.

23.    Defendants are illegally transshipping in Brown Bottling's exclusive territory on a continual basis, improperly free-riding off Brown Bottling's decades-long investment in its exclusive territory, and have intentionally sought to steal accounts and sales from Brown Bottling's exclusive customer base.

24.    Defendants' improper, malicious, and unauthorized conduct has caused significant and irreparable damage to Brown Bottling through lost profits, disruption in customer relationships and local market prices, and the degradation of Brown Bottling's goodwill and enterprise value.

25.    Defendants' unauthorized transshipping has also interfered with Brown Bottling's ability to comply with the contractual obligations it owes to PepsiCo and KDP, such as preventing Brown Bottling from stopping the sale of materially different and non-genuine PepsiCo and KDP products to local customers, and competing effectively against other brand owners like Coca-Cola.

8

26.   In addition, the customer disruption caused by all or some of the Defendants has resulted in Brown Bottling losing lucrative accounts that yield hundreds of thousands of dollars in yearly revenue for Brown Bottling.

27.   To prevent any additional harm to its business and the integrity of its exclusive territory and the PepsiCo and KDP brands, Brown Bottling filed this lawsuit and asks the Court to grant the relief requested below.

## PARTIES

28.   Plaintiff Brown Bottling Group, Inc. is a Mississippi corporation that maintains its principal place of business at 591 Highland Colony Parkway, Ridgeland, MS 39157.

29.   Defendant Imperial Trading Co., L.L.C. is a Mississippi limited liability company that maintains its principal place of business at 701 Edwards Avenue, Elmwood, LA 70123.

30.   Defendant Long Wholesale, Inc. is a Mississippi corporation that maintains its principal place of business at 5173 Pioneer Drive, Meridian,  MS 39301.

31.   Defendant AAA Cash & Carry Wholesale, Inc. is a Mississippi corporation that maintains its principal place of business at 115 Grand Oaks Boulevard, Clinton, MS 39056.

## JURISDICTION & VENUE

32.    This Court has jurisdiction under 28 U.S.C. § 1331. Brown Bottling's claims arise under federal law, including the Lanham Act (15 U.S.C. § 1125(a)), the Soft Drink Interbrand Competition Act (15 U.S.C. § 3501), and the Federal Declaratory Judgment Act (28 U.S.C. § 2201).

33.    Under 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over Brown Bottling's appended state law claim for tortious interference with business relations, which arises under Mississippi state law. This claim is related to, and arises out of, the same transaction and occurrence as Brown Bottling's federal claims and thus forms part of the same case or controversy.

34.    This Court has personal jurisdiction over Defendants because of their continuous and systematic contacts with the State of Mississippi, including substantial and regular business operations throughout the State, where they routinely distribute and sell merchandise to retailers and customers located within the State.

35.    Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Brown Bottling's claims occurred—and will continue to occur—in this District.

## GENERAL ALLEGATIONS

## I.    THE SOFT DRINK INDUSTRY

36.    Carbonated soft drinks ("CSD") are a subset of liquid refreshment beverages which consist primarily of carbonated water, sweetener, a flavor base called "concentrate" and other ingredients.

37.    Generally, the brand owner will manufacture and sell concentrate to its licensed bottlers who in turn manufacture, distribute, and sell the finished CSDs to its customers.

### A.    Concentrate Producers: Makers of Proprietary Concentrate

38.    Originally, the CSD industry has been vertically segregated, with the national concentrate producers (like PepsiCo and KDP) producing the proprietary concentrate and independent bottlers (like Brown Bottling) manufacturing and supplying the finished CSDs to customers in their exclusive, licensed territories.

39.    PepsiCo, for instance, is primarily a concentrate producer. It manufactures and packages PepsiCo's proprietary concentrate, which Caleb Bradham, a North Carolina pharmacist, created in 1893 as a cure for dyspepsia.

40.    PepsiCo's business struggled in its early years. It declared bankruptcy in 1923 and again in 1932. But, with the help of its independent licensed bottlers and their capital investments, PepsiCo's business took off during the Great Depression when it lowered the price of its 12-oz bottle to a nickel—the same price

Coke charged for a 6.5-oz bottle. In the following years, PepsiCo built a successful marketing strategy around its famous radio jingle: "Twice as much for a nickel, too."

**B.   The Bottlers: Manufacturers and Suppliers of Finished Soft Drink Products**

41.    In the early days of the industry, the concentrate producers lacked both the financial capacity and resources to establish and maintain vertically integrated bottling production and distribution networks. The bottling and canning process was capital-intensive and involved high-speed production lines.

42.    This process was further cost-prohibitive because of  the significant expense associated with delivering the finished CSDs. Asa Candler, the sole owner of Coca-Cola in 1887, aptly explained that it would be too expensive to bottle Coca-Cola in Atlanta, then ship it all over the country: "Soft drinks are mostly water, and water is both heavy and expensive to ship," Candler said.

43.    Production efficiencies demanded a network of local bottlers capable of manufacturing, selling, distributing, promoting and delivering finished CSDs in exclusive geographic territories.

44.    In the case of PepsiCo and KDP bottlers, the bottlers buy concentrate from PepsiCo and KDP, add carbonated water, sweetener and other ingredients, and bottle or can the finished CSD.

45.    But bottlers don't just bottle. They are also charged with promoting, marketing, selling, distributing and delivering finished CSDs directly to the customers located in their exclusive licensed territories.

**C.** **The Grant of Exclusive Territorial Rights to PepsiCo and KDP Bottlers**

46.     The historical right of independent bottlers to territorial exclusivity is the foundation of the soft drink industry. Because of the substantial capital investment required to manufacture, sell, and distribute liquid refreshment beverages, it was necessary to grant the bottlers exclusivity in order to persuade them to make such investments.

47.     To that end, almost a century ago, PepsiCo began entering into Exclusive Bottling Appointments with its independent bottlers, while KDP began entering into Exclusive License Agreements (collectively "EBAs"). The EBAs are perpetual license agreements that authorize bottlers to serve as the exclusive manufacturer, distributor, and seller of trademarked PepsiCo and KDP products within an exclusive geographic territory. The EBAs also give bottlers sole discretion to set the prices charged for the PepsiCo and KDP brands sold in their exclusive territories.

48.     As the Tenth Circuit observed in a landmark decision, "PepsiCo has historically viewed . . . its grants of exclusive territories to its independent bottlers, as the core of its overall business structure" and, in addition, that the promise of territorial exclusivity was the only way to "persuade" independent businessmen to make the large capital investment and become a PepsiCo bottler. *See Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1249 (10th Cir. 2005).

13

49.     In support, the *Pittsburg* Court cited the testimony of former PepsiCo President Walter S. Mack:

> [W]e had to give them confidence in the early days that we were going to win our trademark suits and that they were taking on a beverage which they would have the exclusive right to from then on for the rest of their lives . . . . [We told the bottlers] that the parent company would protect their franchise, the terms and conditions of the franchise, and do everything we could to protect both the trademark and the name and their territory for them on an exclusive basis. *Id.*

50.     And, as the *Pittsburg* Court noted, the EBAs and the grant of exclusive territorial rights were given to the independent bottlers "for the rest of their lives or in perpetuity." *See id.*

### D.     The Competitive Advantages of Exclusive Territories

51.     PepsiCo and KDP granted exclusive territories not only to incentivize further bottler investment, but also to build increased consumer demand for PepsiCo and KDP brands and to benefit from resultant competitive advantages.

52.     Distributing CSD through exclusive territories is the norm. Other industries—telecommunications, magazines, automobiles, clothes, and consumer electronics—have also implemented exclusive territories to sell and distribute their products.

53.     Additional benefits of exclusive territories include enhanced and efficient marketing of the product to consumers. In addition, constant monitoring and product freshness efforts by local bottlers helps remove outdated soft drinks from the supply chain. These merchandising and product rotation measures also

build  customer loyalty and foster frequent personal contact with customers and consumers.

54.    An additional benefit of exclusive territories is the elimination of overlapping and redundant sales efforts by authorized (or unauthorized) distributors. It is inefficient for PepsiCo, KDP, and other brand owners to have untrained salesmen employed by unauthorized distributors selling its product. Further, competing for the same customers, engaging in inconsistent marketing, and sending untrained or unfocused sales representatives into the territory adversely impacts the longstanding customer goodwill Brown Bottling and other independent bottlers have developed over the course of decades.

55.    For these reasons, exclusive territories are the only way to afford independent bottlers to compete in the interbrand market—against, say, Coca-Cola. By ensuring the quality and integrity of PepsiCo and KDP products, promoting  and enabling bottlers to invest in their territories, employ trained and dedicated sales representatives able to execute national, regional, local and customer specific marketing campaigns, and provide continuous and superior  customer service, Brown Bottling and other licensed bottlers are able to achieve maximum distribution in the marketplace and vigorously push the sale of PepsiCo and KDP brands in their respective licensed exclusive territories.

## II.   BROWN BOTTLING

### A.   Mississippi Origins

56.   Brown Bottling has been among PepsiCo and KDP's preeminent independent bottlers for nearly 50 years.

57.   In 1971, Kenneth Brown, a veteran of the Second World War, purchased the franchise rights for Dr. Pepper and Pepsi products for 29 counties spanning across Jackson, Meridian, and Hattiesburg, Mississippi.

58.   Times were hard in the beginning and profits were low, but with Kenneth Brown and his team's hard work and determination, the company began to grow. "Do it up Brown" became the rallying cry—a slogan representing Kenneth Brown and his team's dedication and commitment to being the best of the best.

59.   In 1980, Kenneth's son, Bill Brown, joined the company as Vice President. After eight years of on-the-job training and improving his knowledge of the company and the industry, Kenneth Brown promoted Bill Brown to President of the company in 1988. To better position the company for growth, Bill Brown reorganized operations and changed the name of the company from Southern Mississippi Bottling Company to Brown Bottling Group. He also continued the company's expansion by establishing a corporate office.

60.   Growth continued in 1989 when Brown Bottling Group purchased the franchise rights for McComb and Natchez, adding 16 more counties to the

company's service area. In 1998, Bill Brown implemented a strategy to grow the business by investing in additional local sales and marketing initiatives.

61.     The company continued to grow and has undergone an unprecedented building and expansion plan. In December 2007, Brown Bottling's sales facility for the Jackson area relocated to a state-of-the-art facility with more than 100,000 square feet of office and warehouse space located on 35 acres in Brandon. The warehouse is equipped with photosynthetic lights, interior walls are painted white, and packaging is recycled.

62.     In addition to the new Jackson facility, Hattiesburg, McComb, Meridian, Natchez, and the corporate office have been completely remodeled or rebuilt. Moreover, during the 2007 and 2008 timeframe, Brown Bottling finished constructing a separate state-of-the-art facility in Hattiesburg.

63.     All locations have state-of-the-art technology and are designed to maximize productivity and efficiency.

64.     The state-of-the-art facilities built by Brown Bottling are just a few of many examples demonstrating that Brown Bottling has devoted significant investments (for over 50 years) in the local community to increase and maintain demand for its product.

65.     For instance, Brown Bottling also invests in the local community by supporting hundreds of local organizations and institutions through donations and philanthropic partnerships. Among others, Brown Bottling actively supports the

17

work of Canopy Children's Solutions, Batson Children's Hospital at the University Medical Center, Mississippi Symphony Orchestra, Hattiesburg Area Development Partnership, Sanderson Farms PGA Golf Championship, Brandon Amphitheater, Andrew Jackson Council, Boy Scouts of America, and numerous chambers of commerce, schools, youth organizations and youth sports organizations.

66.     In 2007, Brown Bottling won the Donald M. Kendall Bottler of the Year award.

67.     Today, Brown Bottling has the exclusive contractual right to sell and distribute trademarked PepsiCo and KDP products in more than 30 counties throughout central and southern Mississippi—employing over 400 Mississippians throughout its exclusive territory, all of whom work-full time on servicing the needs of local retailers and consumers and growing local demand for the PepsiCo and KDP brands.

**B.     Brown Bottling's EBAs**

68.     The EBAs are fully enforceable contracts between Brown Bottling and PepsiCo and KDP. The EBAs also govern the parties' respective obligations in connection with the manufacture, distribution, and sale of PepsiCo and KDP brands in Brown Bottling's assigned territory. Example copies of Brown Bottling's EBAs with PepsiCo and KDP are attached hereto as **Exhibit 1** and **Exhibit 2**, the terms of which are incorporated by reference.

69.    Under its EBAs with PepsiCo, Brown Bottling must, among other obligations:

a.  "Purchase" at PepsiCo's price Brown Bottling's "requirements of [Pepsi-Cola] concentrates, syrups, or other beverage bases for the bottling of [Pepsi-Cola]" (**Exhibit 1,** Exclusive Bottling Appointment of Brown Bottling, ¶ 5);

b.  "Never distribute or permit the sale of any [PepsiCo product] which is in any way below [PepsiCo's] requirements or standards" (***id.*** ¶ 7);

c.  "Push vigorously the sale of bottled [PepsiCo Brands] throughout the entire territory" and "fully meet and increase the demand for [PepsiCo Brands] throughout the Territory" (***id.***¶ 9);

d.  "Secure full distribution up to the maximum sales potential therein through all distribution channels or outlets available to soft drinks" (*id.*);

e.  "Service all accounts with frequency adequate to keep them at all times fully supplied with [PepsiCo Brands]" (*id.*);

f.  Use its "own salesmen and trucks, (or salesmen and trucks of independent distributors, of whom [PepsiCo] approves), in quantity adequate for all seasons" (*id.*);

g.  "Actively advertise, in all reasonable media including adequate point-of-purchase advertising, and vigorously engage in sales promotion of, bottled [PepsiCo Brands] throughout the Territory" (*id.*); and

h. "At all times cooperate to the full extent required by [PepsiCo] with [PepsiCo's] Product Control programs" and "permit [PepsiCo's] agents to conduct field checks in the Territory" (**id.** ¶ 10).

70.     Brown Bottling's EBAs with KDP contain materially similar terms.

71.     Importantly, the EBAs also expressly authorize Brown Bottling—and no one else—to use and handle the PepsiCo and KDP trademarks. (*Id.* ¶ 15.)

**C.     Brown Bottling's Exclusive Territory**

72.     The EBAs also establish the boundaries of Brown Bottling's designated exclusive territory.

73.     Pursuant to its EBAs with PepsiCo, PepsiCo has granted Brown Bottling the sole and exclusive right to manufacture, distribute, and sell trademarked PepsiCo beverage products, including, among other brands, Pepsi, Mountain Dew, Sierra Mist, Sobe, Tropicana, Lipton, Mug Root Beer, Starbucks bottled and canned coffee drinks, Aquafina, and Dole in the following geographic areas:

In the STATE OF MISSISSIPPI:

The COUNTIES of Adams, Amite, Claiborne, Clarke, Copiah, Covington, Forrest, Franklin, Greene, Hinds, Issaquena (only the southern portion of the County lying east of a straight line drawn due south across the Country from the southwestern corner of Sharkey county), Jasper, Jefferson, Jefferson Davis, Jones, Kemper, Lamar, Lauderdale, Lawrence, Lincoln, Madison, Marion, Neshoba, Newton, Perry, Pike, Rankin, Simpson, Smith, Walthall, Warren, Wayne, Wilkinson, Yazoo.

In the STATE OF ALABAMA:

The COUNTIES of Choctaw and Sumter.

74.    Separately, pursuant to its EBAs with KDP, KDP has granted Brown Bottling the sole and exclusive right to manufacture, distribute, and sell certain trademarked KDP beverage products in the following geographic areas, as outlined below:

a. *Dr. Pepper Brands*:

In the STATE OF MISSISSIPPI:

The COUNTIES of Clarke, Copiah (North of an east and west line running along the most southerly boundary of and to include the town of Hazlehurst), Covington, Forrest, Greene, Hinds, Humphreys (That part of the county lying east of the following described line: Beginning at a point where State Highway 7 intersects the northern boundary of the county, then following said State Hwy. 7 to its junction with U.S. Hwy. 49W at the town of Belzoni, MS; then continuing south on U.S. Hwy. 49W to the southern limits of the town of Louise, then due west in a straight line to the west boundary line of the county, excluding from the Jackson MS franchised territory the towns of Swiftown, Belzoni, Silver City, Midnight and Louise and all dealer outlets on both sides of said described highways), Jasper, Jefferson Davis, Jones, Kemper, Lamar, Lauderdale, Madison, Marion, Neshoba, Newton, Perry, Rankin, Scott (excluding the towns of Hillsboro and Harperville and all towns and dealer outlets on and alongside of State Hwy. 35 and roads connecting these towns of Hillsboro and Harperville and leading from said towns in a northerly direction to the Leake County, MS boundary line; the town of lake and dealer outlets on U.S. Hwy. 80, leading from the town of Lake eastward to the Newton County, MS boundary line), Simpson, Smith, Wayne, Yazoo.

In the STATE OF ALABAMA:

The COUNTIES of Choctaw and Sumter.

b. *Canada Dry Brands*:

21

In the STATE OF MISSISSIPPI:

The COUNTIES of Adams, Amite, Claiborne, Clark, Copiah, Covington, Forrest, Franklin, Greene, Hinds, Issaquena (that portion of the county lying east of a straight line drawn due south across said County from the southwestern corner of Sharkey County to the southern boundary of Issaquena County), Jasper, Jefferson, Jefferson Davis, Jones, Kemper, Lamar, Lauderdale, Lawrence, Lincoln, Madison, Marion, Neshoba, Newton, Perry, Pike, Rankin, Scott (All of the county except the following: the towns of Hillsboro and Harperville and all towns and dealer outlets on and alongside of State Hwy. 35 and roads connecting those towns of Hillsboro and Harperville and leading from said towns in a northerly direction to the Leake County, MS boundary line; the Town of Lake and dealer outlets on U.S. Hwy. 80, leading from the town of Lake eastward to the Newton County, MS boundary line), Simpson, Smith, Walthall, Warren, Wayne, Wilkinson, Yazoo

In the STATE OF ALABAMA:

The COUNTIES of Choctaw and Sumter.

c. *Sunkist & Hawaiian Punch Brands:*

In the STATE OF MISSISSIPPI:

The COUNTIES of Adams, Amite, Claiborne, Clark, Copiah, Covington, Forrest, Franklin, Greene, Hinds, Jasper, Jefferson, Jefferson Davis, Jones, Kemper, Lamar, Lauderdale, Lawrence, Lincoln, Madison, Marion, Neshoba, Newton, Perry, Pike, Rankin, Scott, Simpson, Smith, Walthall, Warren, Wayne, Wilkinson, Yazoo
In the STATE OF ALABAMA:

The COUNTIES of Choctaw and Sumter.

75.     PepsiCo and KDP soft drink products in Brown Bottling's territory face substantial and effective (if not fierce) competition from other bottlers licensed to sell competing liquid refreshment beverages of the same general class.

76.     As noted by the Federal District of Maryland, "[i]n addition to the fierce competition between the Coke and Pepsi brands . . . there is overwhelming evidence that [bottler territories] are awash with hundreds of effectively competing soft drinks, fruit juices, and other liquid concoctions." *Sun Dun, Inc. of Washington v. Coca-Cola Co.*, 770 F. Supp. 285, 287 (D. Md. 1991).

77.     "[T]he fact is that when one gets to the soft drink machine, there is a substantial and effective range of competing products," *see id.*, and the competitive landscape for the sale of soft drink products to the customers and accounts located in Brown Bottling's exclusive territory is no exception.

78.     Yet, through its own diligence, high quality service, and world-class employees, Brown Bottling has done more than simply vigorously push the sale of PepsiCo and KDP brands; it has made PepsiCo- and KDP-branded products the preferred beverages in its exclusive territory.

**D.     Brown Bottling's Customers**

79.     Brown Bottling sells and delivers PepsiCo and KDP products to customers through Direct-Store-Delivery—or DSD. Under the DSD route to market system, Brown Bottling manages the PepsiCo and KDP products in customer outlets by securing shelf space, merchandising the products, seeking advantaged positioning of the products, and building and maintaining competitive advantage with superior points of interruption and displays.

23

80.    Brown Bottling distributes and sells to every conceivable type of customer located in its exclusive territory: small grocery stores, drug stores, supermarkets, mass merchandisers, convenience stores, vending companies and gas stations, and any other outlets that sell finished CSDs.

## III.    TRANSSHIPPING

81.    Sometimes finished PepsiCo and KDP products find their way into the hands of third parties who then, without authorization and in violation of federal law, resell those products to customers located in the exclusive territory of a licensed bottler. Under these circumstances, the third party becomes an unauthorized competitor of the legally operating bottler who owns the exclusive territory.

82.    This practice is known as "transshipping"—and it poses the most significant threat to the exclusive territories of independent bottlers like Brown Bottling.

83.    The damage caused by transshippers is real, significant, and well-documented:

a. Transshippers do not provide the critical sales support, product rotation and merchandising services to the accounts they sell to, causing large quantities of outdated PepsiCo KDP products to sit on retail shelves.

b. Transshippers are not interested in increasing shelf space for existing PepsiCo and KDP products, maximizing customer sales and profits, or

24

developing customer support   for new and emerging trademarked products. Instead, transshippers are focused solely on maximizing short term sales. This ultimately injures the ability of the licensed bottlers of PepsiCo and KDP to adequately compete against other brand owners like Coca-Cola.

c.  Transshippers are reliant on the practice of "free-riding," or improperly reaping the benefits of the independent bottlers' multi-million-dollar investments and their decades-long efforts to promote and increase local demand for PepsiCo ad KDP products.

d.  Transshippers sell PepsiCo and KDP products at low prices; they are not concerned with customer service or the adverse impact that poor customer service has on the purchasing consumer. The net effect is disruption, which causes customers to reduce space allocated to the sale of PepsiCo and KDP products or to buy exclusively from other brand owners like Coca-Cola.

e.  Transshipping places financial strains on licensed bottlers and diminishes (or inhibits altogether) their ability to engage in the effective local advertising and promotional activities required of them by PepsiCo and KDP.

f.  Transshipping leaves licensed bottlers unable to adequately forecast demand, often resulting in bottlers' maintaining too little or too much inventory in their warehouses.

84.    To preserve the integrity of the territorial system, and in order to ensure licensed bottlers are able to comply with their contractual obligations under the EBAs, PepsiCo and KDP forbid their licensed bottlers from transshipping outside their exclusive territories.

## IV.    THE SOFT DRINK INTERBRAND COMPETITION ACT

85.    In 1980, Congress enacted the Soft Drink Act, which provides:

Nothing contained in any antitrust law shall render unlawful the inclusion and enforcement in any trademark licensing contract or agreement, pursuant to which the licensee engages in the manufacture (including manufacture by a sublicensee, agent, or subcontractor), distribution, and sale of a trademarked soft drink product, of provisions granting the licensee the sole and exclusive right to manufacture, distribute, and sell such product in a defined geographic area or limiting the licensee, directly or indirectly, to the manufacture, distribution, and sale of such product only for ultimate resale to consumers within a defined geographic area: *Provided*, That such product is in substantial and effective competition with other products of the same general class in the relevant market or markets.

15 U.S.C. § 3501.

86.    The Soft Drink Act was enacted by Congress following an intensive investigation into the soft drink industry. Based on the results of that investigation, Congress passed the Act to preserve and protect the exclusive territories of licensed bottlers. Specifically, Congress determined that the exclusive territorial arrangements—the EBAs—warranted protection because the geographic restraints

26

fostered (rather than hindered) interbrand competition. *See Zimmerman*, 836 F.2d at 177.

87.    In *Pittsburg*, the Tenth Circuit also recognized that Congress's express intent of the Act was to preserve exclusive territories and recounted that Congress heard testimony from PepsiCo officials that "PepsiCo needed the Act's passage to protect its right to issue bottlers EBAs." 431 F.3d at 1249–50.

88.    In furtherance of protecting the EBAs and other similar arrangements, the Act expressly provides for the "enforcement" of agreements limiting unauthorized sales in a licensed bottler's exclusive territory both "directly or indirectly," and "is aimed at combatting both bottlers and third parties who transship." *See Zimmerman*, 836 F.2d at 177.

89.    As the Third Circuit observed,  in "[p]roviding for the limitation of manufacture, distribution, and sale 'only for ultimate resale to consumers within a defined geographic area,'" the enforcement "language of the Act squarely applies to the entire chain of distribution, from in[i]tial manufacture right through the ultimate sale to the consumer." *Id.*

90.    In fact, as the North Carolina Supreme Court observed, the "conclusion that the Soft Drink Act authorizes bottlers to restrict [sales] in order to prevent transshipping has been approved in every jurisdiction that has considered the issue." *Owens*, 412 S.E.2d at 673 (citing voluminous case law).

91.     Further, as the *Owens* court noted, "[i]f licensors may require licensees to prevent transshipment as a condition of the licensing agreement, licensees must be empowered to take reasonable steps to comply with such agreement." *Id*. That is exactly the case here: PepsiCo expressly requires Brown Bottling, and all other licensed bottlers (including the bottlers now owned by PepsiCo), to prevent transshipping.

92.     Moreover, sales prohibitions leveled by the concentrate producers, such as PepsiCo, are similarly enforceable under the Act.

93.     Soon after the Act became law, PepsiCo's then-CEO and President, John Sculley, sent a letter to all PepsiCo bottlers lauding the Act and the enforcement authority it conferred:

> The Soft Drink Interbrand Competition Act of 1980 is now the law of the land. . . . We intend to avail ourselves fully of every right conferred by this law, since store-to-store delivery and full development of each territory are the hallmark and backbone of our enterprise. . . . This Act confirms that we have the power to grant the sole and exclusive right to manufacture, distribute and sell our products in a defined territory and to limit, directly or indirectly, the manufacture, distribution, and sale of such products only for ultimate resale to customers within that territory.

(**Exhibit 3**, Sculley Letter to All Bottlers.)

94.     Mr. Sculley further explained that the rights and limitations set forth in the Act "are a part of the Exclusive Bottling Appointment which we have issued to you and we are very pleased to confirm to you that our Bottling Appointments as

to territorial exclusivity and territorial restrictions are identical to the provisions permitted by this statute." (*Id.*)

## V.   DEFENDANTS' TRANSSHIPPING IN BROWN BOTTLING'S EXCLUSIVE TERRITORY

95.    Seeing an opening to make profit from unwitting retailers, Defendants have jumped at the chance to improperly resell PepsiCo and KDP products to Brown Bottling's exclusive customer base. In so doing, Defendants resell trademarked PepsiCo and KDP Brands without PepsiCo, KDP, or Brown Bottling's authorization, in disregard of Brown Bottling's rights under the EBAs and in violation of federal law.

96.    Defendants know that they are not licensees of PepsiCo or KDP, nor are they authorized by Brown Bottling to sell and distribute trademarked PepsiCo or KDP products in its exclusive territory. Moreover, Defendants intentionally engage in surreptitious liquid refreshment beverage purchases from anyone willing to make a short-term profit in complete disregard of the substantial capital investments made by Brown Bottling over the years to fulfill its obligations to vigorously sell and distribute PepsiCo and KDP products in its exclusive territory.

97.    Because Defendants acquire their trademarked PepsiCo and KDP products from illegitimate sources and unauthorized grey markets, Defendants ultimately sold (and continue to sell) products to local retailers and consumers that were not subject to PepsiCo's unique and mandatory quality control standards. And because those quality control standards were neither followed nor observed by

Defendants, the soft drink products they sold to Brown Bottling's customers were damaged and their carbonation, freshness, and flavor levels were negatively impacted.

98.   For that reason, the unauthorized system Defendants created to acquire and distribute trademarked PepsiCo and KDP products caused those products to undergo material changes that would not have been readily apparent to the retailers or consumers who subsequently purchased those products. The sale of this inferior and materially different product caused confusion, mistake, and deception on the part of local retailers and consumers, and Defendants' practice of injecting sub-par product into Brown Bottling's exclusive territory is intentional, willful, and malicious.

99.   Defendants have no qualms soliciting and engaging in a pattern and practice of unauthorized sales of PepsiCo and KDP products to customers located in Brown Bottling's exclusive territory.

100.   By transshipping trademarked PepsiCo and KDP brands into Brown Bottling's exclusive territory, Defendants have damaged (and continue to damage) Brown Bottling, local retailers, and consumers by, among other things, (1) undermining the exclusive territorial rights of Brown Bottling; (2) supplying retailers and consumers with non-genuine, materially different, and outdated PepsiCo and KDP products, (3) tainting PepsiCo's and KDP's trademarks with inadequate customer service and substandard product, (4) undermining the hard-

earned reputation and capital investments of Brown Bottling, and (5) causing Brown Bottling to temporarily or permanently lose valued customers or sales in its exclusive territory.

101.   Indeed, Brown Bottling's  life blood is its relationships with its customers and Defendants' conduct interferes with those relationships and clouds them with confusion.

102.   In Brown Bottling's territory, the PepsiCo and KDP brands are synonymous with Brown Bottling. But, by calling on Brown Bottler's exclusive customer base, selling and distributing PepsiCo and KDP brands to its customers, and using and handling PepsiCo and KDP trademarks, Defendants hold themselves out as a licensee authorized to manufacture, sell, and distribute PepsiCo and KDP products in Brown Bottling's exclusive territory. The end result is that the customers are confused—deceived even—into thinking that Defendants are authorized to sell trademarked PepsiCo and KDP products when they are not.

## VI.   DEFENDANTS IGNORE BROWN BOTTLING'S CEASE & DESIST LETTERS

103.   In December 2018, Brown Bottling sent cease and desist letters to Defendants after learning that Defendants had started transshipping in Brown Bottling's exclusive territory and had stolen accounts from Brown Bottling's exclusive customer base.

104. Copies of the cease and desist letters sent to Defendants are attached hereto as **Exhibit 4, Exhibit 5, and Exhibit 6** and are incorporated by this reference.

105. The cease and desist letters advised the Defendants of Brown Bottling's exclusivity rights and identified the specific customers and accounts that each Defendant has (and is) selling to.

106. The cease and desist letters further expressly informed the Defendants that they are interfering with Brown Bottling's legitimate and statutorily-ratified business expectancies and are improperly engaged in the unauthorized retail distribution of PepsiCo's and KDP's trademarked goods.

107. Undeterred by Brown Bottling's cease and desist letters, Defendants continue to transship in Brown Bottling's territory with knowing disregard for Brown Bottling's rights. Defendants do so unlawfully, intentionally, and maliciously.

108. As a result, Defendants have caused significant damage to Brown Bottling, the PepsiCo and KDP brands, and the customers and consumers located in Brown Bottling's exclusive territory.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment Under the Federal Declaratory Judgment Act & F.R.C.P. 57, Brown Bottling against All Defendants)

109. Brown Bottling incorporates by reference each and every allegation set forth above, as though fully set forth herein.

110.    Under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, Federal Rule of Civil Procedure 57, and settled principles of federal law, this Court "may declare the rights and other legal relations of any interested party" in a case of actual controversy within its jurisdiction.

111.    PepsiCo and KDP soft drink products in Brown Bottling's exclusive territory face substantial and effective (if not fierce) competition with other products of the same general class.

112.    In the fall of 2018, Brown Bottling discovered that Defendants were illegally and improperly transshipping and selling trademarked PepsiCo and KDP products to retailers and consumers located in Brown Bottling's exclusive territory.

113.    Brown Bottling sent Defendants cease and desist letters advising that Brown Bottling has the exclusive right to sell trademarked PepsiCo and KDP products within the boundary of Brown Bottling's exclusive territory. Brown Bottling  sent those cease and desist letters in part to enforce its longstanding exclusive territorial rights.

114.    Defendants have ignored Brown Bottling's cease and desist letters and have continued to transship trademarked PepsiCo and KDP products in Brown Bottling's exclusive territory—willfully, intentionally, and maliciously. As a result, Defendants' conduct has damaged, and will continue to damage, Brown Bottling and its exclusivity rights.

115.   There is a real, actual, and substantial controversy that currently exists between the parties with regard to whether Defendants may continue to transship in Brown Bottling's exclusive territory in violation of Brown Bottling's rights under the EBAs and the rights conferred to Brown Bottling under the Soft Drink Interbrand Competition Act.

116.   The parties' rights, status, or legal relations are affected by Defendants' continued and unauthorized transshipping in Brown Bottling's exclusive territory and by Defendants' refusal to comply with Brown Bottling's cease and desist demands in accordance with the Soft Drink Act and settled principles of federal law.

117.   Brown Bottling has acted lawfully and within its authority at all relevant times.

118.   A judicial declaration of Brown Bottling's rights, status, and legal relations relative to Defendants' continued transshipping would terminate the controversy and remove uncertainty.

119.   All persons who have an interest that would be affected by the requested declaration are parties to this action or have otherwise been cited (i.e., PepsiCo and KDP), and the requested declaration will not prejudice the rights of any non-parties.

120.   Brown Bottling therefore seeks the following declarations:

a. Brown Bottling has the sole and exclusive right to manufacture, distribute, and sell trademarked PepsiCo and KDP products in Brown Bottling's exclusive territory pursuant to the rights granted to Brown Bottling under its EBAs and the Soft Drink Interbrand Competition Act;

b. PepsiCo and KDP soft drink products in Brown Bottling's exclusive territory face substantial and effective competition from other liquid refreshment beverages of the same general class; and

c. Defendants are not authorized or licensed to manufacture, sell, distribute, deliver, or stock trademarked PepsiCo and KDP soft drink products within the boundaries of Brown Bottling's exclusive territory.

<u>**SECOND CLAIM FOR RELIEF**</u>
**(Tortious Interference with Actual or Prospective Business Relations, Brown Bottling against All Defendants)**

121.    Brown Bottling incorporates by reference each and every allegation set forth above, as though fully set forth herein.

122.    Defendants have maliciously interfered with Brown Bottling's actual, existing, and prospective business relations by transshipping to Brown Bottling's exclusive base of customers and accounts that purchase trademarked PepsiCo and KDP products in Brown Bottling's exclusive territory.

123.    Under the EBAs and the Soft Drink Interbrand Competition Act, Brown Bottling has the sole and exclusive right to any and all business

relationships in Brown Bottling's exclusive territory with regard to the sale and distribution of any and all PepsiCo and KDP products.

124.   Defendants are sophisticated businesses that have long been active in the beverage industry and have actual knowledge of PepsiCo's and KDP's EBAs with Brown Bottling and Brown Bottling's business relationships with the customers and accounts in Brown Bottling's exclusive territory that purchase PepsiCo and KDP soft drink products. In addition, Defendants' operations have overlapped with Brown Bottling's DSD system for years and, as a result, Defendants know the geographic boundaries and customers associated with Brown Bottling's exclusive territory.

125.   Separately, in December 2018,  Brown Bottling sent Defendants cease and desist letters advising Defendants as follows:

a.   Brown Bottling has been granted the exclusive right by PepsiCo and KDP to manufacture, distribute, and sell trademarked PepsiCo and KDP products in a defined and exclusive geographic territory that spans all or portions of 36 counties in Central and Southern Mississippi and two counties in Alabama;

b.   Brown Bottling has the exclusive right to negotiate and otherwise manage business relationships and expectations relating to sales and distribution of PepsiCo and KDP products with all customers and potential customers doing business within its exclusive territory;

36

c.  Defendants have engaged in improper and unauthorized sales of trademarked PepsiCo and KDP products in a manner that interferes with Brown Bottling's existing customer agreements, as well as with Brown Bottling's prospective business relationships and business expectancies within its exclusive territory;

d.  Through their intrusion into Brown Bottling's exclusive territory, Defendants are intentionally and maliciously attempting to usurp Brown Bottling's sales volume and corresponding revenue and goodwill with customers; and

e.  Through their intrusion into Brown Bottling's exclusive territory, Defendants are engaging in unfair competition, engaging in conduct contrary to the Soft Drink Interbrand Competition Act, and free-riding off of Brown Bottling's long-term investments in developing customer relationships and growing local demand for the PepsiCo and KDP brands throughout its exclusive territory.

(*See* **Exhibits 4, 5, and 6**.)

126.  Therefore, Defendants have actual knowledge of Brown Bottling's existing and prospective business relationships with the customers and accounts located in Brown Bottling's exclusive territory that purchase PepsiCo and KDP soft drink products.

127.   However, Defendants have blatantly ignored the facts outlined in Brown Bottling's cease and desist letters and have continued to transship and sell PepsiCo and KDP products to Brown Bottling's exclusive customer base with malicious intent to interfere with—and injure—Brown Bottling's longstanding business.

128.   Defendants are also interfering with Brown Bottling's actual and prospective business relations by offering Brown Bottling's customers non-genuine and materially different trademarked PepsiCo and KDP products at artificially low prices to steal Brown Bottling's customers.

129.   In addition, Defendants are interfering with Brown Bottling's business relations by encouraging Brown Bottling's customers to purchase trademarked PepsiCo and KDP products from outside the network of exclusive and authorized licensed PepsiCo and KDP bottlers, which is contrary to the stated public policy adopted by Congress, the Soft Drink Interbrand Competition Act, and the territorial distribution system that has defined the soft drink industry for a century.

130.   Defendants' intentional interference with Brown Bottling's actual and prospective business relations is improper, malicious, wrongful and conducted in bad faith for multiple reasons, including but not limited to the following:

   a.   Defendants' conduct is indefensible under federal law and the Soft Drink Interbrand Competition Act.

b.  Brown Bottling expressly advised Defendants that their acts of transshipping interfere with its EBAs, territorial rights, and existing customer relationships, and Defendants ignored Brown Bottling's warnings.

c.  Defendants are knowingly (1) "free-riding" off of Brown Bottling's 50-plus years of capital investments and brand development, (2) reselling sub-par and outdated products to customers and consumers, (3) diminishing interbrand competition by harming the integrity of the PepsiCo and KDP brands, and (4) engaging in anti-competitive conduct that will ultimately hurt consumers and deprive Brown Bottling of its contractual rights and its rights under both state and federal law.

d.  Defendants' interference is done by confusing and deceiving customers. In particular, Defendants have intentionally and improperly misled customers and the consuming public to believe that Defendants are authorized participants of PepsiCo, KDP, and Brown Bottling's exclusive sales network. Indeed, Defendants' transshipped products intentionally look similar to Brown Bottling's products, and Brown Bottling's customers have no way of readily detecting the differences with regard to the quality and composition of the products they purchased.

e.  Defendants do not have a right to sell trademarked PepsiCo and KDP products in Brown Bottling's exclusive territory or to handle and

distribute trademarked PepsiCo and KDP products. Defendants could only have these rights if they were a party to a territorial licensing agreement with PepsiCo or KDP, which they are not.

f.  The social interests in prohibiting Defendants' disruptive conduct has already been settled by Congress and the federal courts. Congress expressly determined that preserving exclusive territories benefits consumers and that transshipping hinders interbrand competition. Moreover, Congress and the federal courts have recognized the importance of protecting Brown Bottling's exclusive territorial agreements with PepsiCo and KDP because those agreements stimulate interbrand competition, encourage further bottler investment, promote customer service, and limit the volume of outdated product that reaches consumers. Accordingly, Defendants' conduct undermines Congress's stated goals and public policy.

131.   Accordingly, Defendants are intentionally, improperly, and maliciously interfering with Brown Bottling's actual and prospective business relationships with the customers in Brown Bottling's exclusive territory that purchase PepsiCo and KDP products.

132.   Defendants have no rights to sell or distribute non-genuine and materially inferior PepsiCo and KDP soft drink products in Brown Bottling's territory.

40

133.   Defendants' conduct has caused Brown Bottling to suffer damages. For example, Defendants have caused a termination of Brown Bottling's actual and prospective business relations with various customers and consumers located in its exclusive territory. Defendants have further interfered with Brown Bottling's business expectancies by selling non-genuine and materially inferior PepsiCo and KDP soft drink products in Brown Bottling's exclusive territories, thereby causing damage to Brown Bottling's reputation and goodwill.

134.   Additionally, by transshipping PepsiCo and KDP brand in Brown Bottling's exclusive territory, Defendants' interference has damaged (and will continue to damage) Brown Bottling by, among other things, (1) undermining the exclusive territorial rights of Brown Bottling; (2) supplying Brown Bottling's customers with poorly manufactured goods or outdated and expired PepsiCo and KDP products, which hurts Brown Bottling's customer relationships and the popularity of PepsiCo and KDP brands in its exclusive territory; (3) supplying fewer and different products to customers which reduces the variety of products sold in Brown Bottling's exclusive territory, thereby decreasing consumer demand for PepsiCo and KDP brands; (4) tainting the experience of Brown Bottling's exclusive customer base relative to the sale of PepsiCo and KDP products by providing inadequate customer service and substandard product; (5) "free-riding" off the hard-earned reputation and massive capital investments of Brown Bottling in its exclusive territory' and (6) causing Brown Bottling to temporarily or permanently

lose valued customers in their territories and costing Brown Bottling hundreds of thousands of dollars in lost revenue.

135.   Accordingly, Brown Bottling is entitled to damages and injunctive relief, as appropriate.

### THIRD CLAIM FOR RELIEF
**(Violation of the Lanham Act, 15 U.S.C. 1125(a)(1)(A), False Affiliation, Brown Bottling against All Defendants)**

136.   Brown Bottling incorporates by reference each and every allegation set forth above, as though fully set forth herein.

137.   Brown Bottling's EBAs with PepsiCo and KDP entitle it to the exclusive right to sell and distribute PepsiCo and KDP products in its exclusive territory.

138.   Defendants have no right or license to sell trademarked PepsiCo and KDP products in Brown Bottling's exclusive territory.

139.   Brown Bottling has spent decades and millions of dollars building its business and establishing goodwill as the only licensed bottler authorized to distribute trademarked PepsiCo and KDP products and the only licensed bottler associated with—or authorized to use—the PepsiCo and KDP trademarks in its exclusive territories.

140.   Defendants have engaged in improper commerce and unfair competition within Brown Bottling's exclusive territory by stealing accounts from Brown Bottling's exclusive customer base and supplying them with trademarked

PepsiCo and KDP products despite having no authority to sell such products in those areas.

141.   To successfully steal accounts from Brown Bottling, Defendants have made numerous false and misleading representations of fact while improperly selling (and promoting the sale of) trademarked PepsiCo and KDP products to various retailers located in Brown Bottling's exclusive territory. Specifically, Defendants sold trademarked PepsiCo and KDP products to customers and consumers without PepsiCo and KDP's approval and through illegitimate channels of trade different from PepsiCo's and KDP's authorized distribution network.

142.   Defendants' s misrepresentations caused confusion and mistake among Brown Bottling's customers by deceiving them to believe that the PepsiCo and KDP products sold by Defendants had the same high-caliber characteristics, quality controls, and freshness associated with PepsiCo, KDP, and Brown Bottling's authorized and approved products. In reality, however, those customers purchased sub-par product that contained materially different characteristics from what retailers and customers understood they were buying.

143.   In this way, Defendants have intentionally and improperly engaged in commerce in a manner that caused customers and the consuming public to believe that Defendants are authorized participants in PepsiCo, KDP, and Brown Bottling's exclusive sales network—creating significant confusion and mistake among retailers and the consuming public. Indeed, Defendants' transshipped products look

similar to Brown Bottling's products and Brown Bottling's customers have no way of readily detecting the differences with regard to the quality and composition of the products they purchased.

144.    Further, the average consumers purchasing soft drink products at gas stations or convenience stores do not exercise a high degree of care (or know not to) when purchasing PepsiCo and KDP products.  Rather, over the decades, consumers have come to depend on the local licensed bottlers to ensure the product they purchase is fresh and quality-controlled.  Defendants' misconduct and misrepresentations, however, has resulted in customers and consumers to be confused, deceived, and mistaken regarding the quality and characteristics of the products they purchase.

145.    Accordingly, Defendants' actions have caused confusion and will likely continue to cause confusion and mistake if they are not not enjoined from selling trademarked PepsiCo and KDP products in Brown Bottling's exclusive territory.

146.    Defendants' actions have directly caused damage and injury to Brown Bottling's business through lost sales and lost goodwill and enterprise value. In addition, Defendants' actions have undermined the exclusivity guaranteed to Brown Bottling under its EBAs and the Soft Drink Act. Defendants' ongoing misconduct will continue to damage Brown Bottling's business.

147.    As a result of the damage caused by Defendants' wrongful conduct, Brown Bottling requests an order entering the following relief:

a. Ordering Defendants that they may not sell, distribute, or deliver (or incentivize the sale, distribution, or delivery of) any and all trademarked PepsiCo and KDP products to any retailers or customers located in Brown Bottling's exclusive territory;

b. Ordering that Defendants may not hold themselves out as authorized or licensed PepsiCo and KDP bottlers, distributors, or sellers to any purchasers or customers of PepsiCo and KDP products located in Brown Bottling's exclusive territory;

c. Ordering that Defendants may not hold themselves out as an agent or affiliate of Brown Bottling, and that it has no right to suggest to Brown Bottling's customers they are authorized or legitimate distributor of PepsiCo and KDP products in Brown Bottling's exclusive territory;

d. Ordering that Defendants take no other action that interferes with Brown Bottling's customers, operations, or exclusive territorial rights;

e. Awarding damages, injunctive, punitive damages, and treble damages for compensation related to the harm Brown Bottling has suffered;

f. Ordering disgorgement of Defendants' profits made in Brown Bottling's exclusive territory associated with Defendants' unauthorized sale of trademarked PepsiCo and KDP products; and

g. Ordering costs of this action, attorneys' fees, and for such further relief the Court finds necessary and proper.

45

**PRAYER FOR RELIEF**

WHEREFORE, Brown Bottling respectfully requests the following relief:

1.     Granting appropriate temporary, preliminary, and/or permanent injunctive and declaratory relief as is necessary to direct Defendants to cease transshipping and selling PepsiCo and KDP products in Brown Bottling's exclusive territory and to enforce and protect Brown Bottling's exclusive territorial rights under the Soft Drink Interbrand Competition Act, the EBAs, and federal law.

2.     Awarding Brown Bottling compensatory damages for the damages caused by Defendants' wrongful actions, including lost profits, damages resulting from harm caused to Brown Bottling's brand and territorial rights, and amounts owed to Brown Bottling from the disgorgement of the profits Defendants made in connection with the unauthorized sale of PepsiCo and KDP products in Brown Bottling's exclusive territory.

3.     Awarding Brown Bottling the cost of this action, including its reasonable attorneys' fees, costs and expenses, and other damages permitted by law including treble and punitive damages under the Lanham Act and any other relevant authority.

4.     Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

46

Dated: February 22, 2019.                    Respectfully submitted,


                                             s/ Phillip S. Sykes
                                             Phillip S. Sykes (MB. No. 10126)
                                             Haley F. Gregory (MB No. 104532)
                                             BUTLER SNOW LLP
                                             Suite 1400
                                             1020 Highland Colony Park
                                             Ridgeland, MS  39157
                                             Post Office Box 6010
                                             Ridgeland, MS 39158-6010
                                             Tel:  (601) 948-5711
                                             Fax:  (601) 985-4500
                                             Email: phillip.sykes@butlersnow.com
                                                     haley.gregory@butlersnow.com


                                             Hugh Q. Gottschalk (*pro hac vice application
                                             to be filed*)
                                             Webster C. Cash III (*pro hac vice application
                                             to be filed*)
                                             Wheeler Trigg O'Donnell LLP
                                             370 Seventeenth Street, Suite 4500
                                             Denver, Colorado  80202
                                             Telephone:   303.244.1800
                                             Facsimile:    303.244.1879
                                             Email: gottschalk@wtotrial.com
                                                     cash@wtotrial.com

                                             *Attorneys for Plaintiff Brown Bottling Group,
                                             Inc.*

46299393.v1